UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHAD HAYSE,

      Plaintiff,

v.

                                                   Civil Case No. 17-13294
                                                   Honorable Linda V. Parker

CITY OF MELVINDALE, a political
Subdivision of the State;
MELVINDALE CITY COUNCIL, a
legislative body of the City of
Melvindale, NICOLE BARNES,
WHEELER MARSEE, MICHELLE
SAID LAND, DAVE CYBULSKI,
CARL LOUVET, and STEVEN
DENSMORE, individuals, sued in
their official and personal capacities

      Defendants.

_____/

## OPINION AND ORDER (1) DENYING PLAINTIFF'S MOTION TO STRIKE AFFIDAVIT OF NICOLE BARNES (ECF NO. 129); (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 121); AND (3) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 122)

Plaintiff Chad Hayse, the former Chief of Police for the City of Melvindale

("Melvindale"), posted a Facebook comment about the merger of police dispatch

systems—an issue on which the Melvindale City Council ("City Council") would

soon vote. He claims that he was fired as a result. Plaintiff filed this lawsuit

against Melvindale, the City Council, then-City Council President Nicole Barnes,

as well as then-City Council members Wheeler Marsee, Michelle Said Land, Dave Cybulski, Carl Louvet, and Steven Densmore (collectively, "Defendants), alleging violations under 42 U.S.C. § 1983 of his right to free speech, liberty interests, and property interests. (Am. Compl., ECF No. 68.)

Presently before the Court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(a), filed on October 15, 2018, (ECF Nos. 121, 122), as well Plaintiff's Motion to Strike Affidavit of Nicole Barnes, (ECF No. 129). Both parties move for summary judgment as to Plaintiff's First Amendment retaliation claim. Defendants move for summary judgment as to Plaintiff's procedural due process claims. The motions are fully briefed and the Court held a hearing with respect to the motions on October 12, 2019.

The Court finds that Plaintiff has failed to show deprivation of a liberty interest. However, fact questions as to the other claims preclude summary judgment. Accordingly, the Court denies Plaintiff's Motion for Summary Judgment, (ECF No. 121), and grants in part and denies in part Defendants' Motion for Summary Judgment, (ECF No. 122). Given that the Court need not rely on the disputed material detailed in Plaintiff's Motion to Strike Affidavit of Nicole Barnes, (ECF No. 129), it is denied as moot.

## FACTUAL BACKGROUND

### Melvindale Debates Police Dispatch Merger

In 2016, City Council readied itself to vote on the proposed merger of Melvindale's and the City of Dearborn's police dispatch systems. Discussions and debates abounded in public meetings, several of which were held over a two month period. (ECF No. 122 at Pg. ID 8915; ECF No. 122-6 at Pg. ID 909; ECF No. 121-6; ECF No. 121-19.)

Melvindale residents set these meetings abuzz with questions: Why is the plan being "kept [a] secret"? What are the cost savings? When will it be implemented? How will it be implemented? Is there an exit plan if something goes wrong? Will police response times change? Will slower response times compromise the safety or lives of children, spouses, and neighbors? (ECF No. 121-6 at Pg. ID 7545, 7560-61, 7586, 7598, 7600.)

Former Melvindale police officers also voiced thoughts during these meetings: Dearborn's slow response time is "unacceptable"; Dearborn's GPS system is inadequate; and Dearborn dispatchers lack critical geographical knowledge. (ECF No. 121-6 at Pg. ID 7499-7503.)

The debate spilled onto Facebook. On June 8, in a thread posted in the "It Takes A Village" Facebook page—a closed Facebook group compromised of

numerous Melvindale residents,[1] including Plaintiff and Defendant Barnes—a resident posted a comment about the merger issue. (ECF No. 121-10 at Pg. ID 8071.) In response, Matthew Furman said that "[he is] a Police officer with City of Melvindale" and began discussing Melvindale's police dispatch system. (*Id.*)

On June 10, an anonymous Melvindale resident posted a lengthy comment about the merger issue, saying in part: "[a]nd there would be a massive increase in costs to Melvindale taxpayers." (*Id*. at Pg. ID 8077.) In response, Patrick Easton—a Melvindale police officer—wrote: "Well written article based on facts! Thank you!" (*Id*. at Pg. ID 8081.) The Mayor of Melvindale also chimed in, explaining the merger's financial benefits and encouraging the It Takes A Village group members to attend public meetings to gather information about the dispatch merger, instead of challenging the Mayor and City Council based on social media posts. (*Id.* at Pg. ID 8082-83.)

### Plaintiff's Path to Termination

Plaintiff also jumped into the conversation, posting two Facebook comments.[2] The parties do not dispute the username, location, and content associated with these two comments:

---

[1] The page moderator may grant access upon any individual request.
[2] The Court does not find Plaintiff's other posts relevant to the inquiry.

## COMMENT #1

<u>Username</u>:  "Melvindale Police Department"

<u>Location</u>:  Posted to the official Melvindale Police Department page

<u>Content</u>:



## COMMENT #2

<u>Username</u>:  "Chad Hayse"

<u>Location</u>:  Posted to the It Takes A Village page
       (In same thread in which the Mayor and Officer Easton posted)

<u>Content</u>:



(*Id*. at Pg. ID 8066, 8073.)

5

On June 13, during a City Council meeting, one of the Defendants asked Plaintiff who posted the "shaft" comment. (ECF No. 122-32 at Pg. ID 10122.) More specifically, Plaintiff was asked who posted the "shaft" comment to the *Melvindale Police Department page*—even though the parties now do not dispute that the actual location of the "shaft" comment was the It Takes A Village page. Plaintiff responded that he did not know who posted the "shaft" comment, but he would investigate and report back. (*Id.*)

The next day, on June 14, Mayor Stacy (Striz) Bazman forwarded Defendants, Plaintiff, and others, screenshots of the threads containing both of the aforementioned comments, stating that she is "forwarding this so everyone has a copy in case they need to reference it" and "hope[s] . . . nothing like this happens again." (ECF No. 121-10 at Pg. ID 8064-65.) Later that day, during a Melvindale Public Safety Commissioners ("PSC") meeting, Plaintiff stated that he posted the "shaft" comment. (ECF No. 122-32 at Pg. ID 10122; ECF No. 121-7 at Pg. ID 7663; ECF No. 122-7 at Pg. ID 9105.) The record does not contain a June 14 meeting transcript and it is unclear whether Plaintiff went on to explain that he in fact posted the "shaft" comment to the It Takes A Village page—not the Melvindale Police Department page as stated by Defendants the previous day.

On July 28, Plaintiff suspended Officer Furman without pay.  (ECF No. 122-29 at Pg. ID 9935.)   Officer Furman accounted for 79 percent of Melvindale's vehicle impounds each month.  (*Id*.)  On August 3, Officer Furman filed a grievance in response.  (ECF No. 125-15.)

Also on August 3, Defendant Barnes introduced a "Complaint for Removal of Chad Hayse" ("Original Complaint") at a City Council meeting.  (ECF No. 121-8 at Pg. ID 7776.)  The Original Complaint stated that Defendant Barnes "[was] exercising [her] right to pursue the removal of [Plaintiff]" based on the following:

> Posting on social media on various dates, i.e., June 6, 2016, June 8, 2016, regarding the Central Dispatch issue, in which the statement was made, "the one getting the shaft may be the taxpayers". [*sic*]  When asked on June 13, 2016 during a council workshop who posted that comment, Mr. Hayse stated that he did not know who made the postings.  However, the following evening, June 14, 2016, at a Public Safety Commission Meeting, Mr. Hayse admitted that he made the posts on social media.  Such comments are inappropriate and derogatory regarding Mr. Hayse [*sic*] function as an appointed official of the City of Melvindale."

(ECF No. 121-14 at Pg. ID 8409.)

Defendants entered into a closed-door session to discuss the Original Complaint and subsequently voted to suspend Plaintiff with pay, pending a pretermination hearing.  (ECF No. 121-6 at Pg. ID 7627-28.)

On or around August 17, Defendant Barnes presented to City Council an Amended Complaint for Removal ("Amended Complaint"). (ECF No. 122-16 at Pg. ID 9415.) "[I]nformation already known by Barnes," as well as a "Towing Report," served as the basis of the Amended Complaint.[3] (ECF No. 122 at Pg. ID 8929-30.) It included five charges:

- COUNT I—"Misuse of the Melvindale Police Department's Social Media and Lying to the Mayor and City Council"

- COUNT II—" Knowingly and Intentionally Providing False Statements To the Commission of Public Safety"

- COUNT III—" Willful Misconduct in Office upon the Usage of Towing Services, Necessary for the Proper Enforcement of the Uniform Traffic Code"

- COUNT IV—"Willful Misconduct in Office by the Improper Issuance of Discipline upon Corporal Matthew Furman"

- COUNT V—" Willful Misconduct in Office by the Usage of Profanity, Vulgarity, and Slanderous Statements Directed Towards Elected and Appointed Public Officials"

---

[3] On August 9, 2016, City Council received a "Towing Report." (ECF No. 122-29 at Pg. ID 9932.) Three weeks earlier, City Council engaged a third party to "[d]etermine the reason(s) for the fluctuation in towing activity by the Melvindale Police Department." (*Id.* at Pg. ID 9929, 9932.) The report concluded that the absence of Officer Furman was "an obvious contributor to the drop." (*Id.* at Pg. ID 9935.) However, the report went beyond the City's towing activity because, according to the report, during the three police officer interviews (including one with Officer Furman), "additional issues were introduced into the review." (*Id.* at Pg. ID 9932.) These "additional issues" included allegations critical of Plaintiff. (*Id.* at Pg. ID 9933.)

(ECF No. 125-16.)  Count I of the Amended Complaint mimicked, in large part, the content of the Original Complaint.  The Court cuts and pastes its content here because the manner in which the Amended Complaint depicts Count I plays a role in this matter:

**Count I:**
**Misuse of the Melvindale Police Department's**
**Social Media and Lying to the Mayor and City Council.**

1.   On, or about, June 6, 2016 through June 8, 2016, Chief Hayse publicly and improperly posted his opposition and his personal and political commentary upon the facebook.com social media web page, including the web page designated as the official facebook page for the City of Melvindale Police Department, which is displayed in the following manner:



Chief Hayse, while providing a notification concerning the Commission of Public Safety's consideration of entering into a central dispatch agreement with the City of Dearborn for emergency services, publicly and improperly posted his opposition and his own personal and political commentary. Chief Hayse also posted numerous inaccurate and irresponsible comments, which included the following remark on June 8, 2016, at 9:07 p.m., as follows:  *"The one getting the shaft may be the tax payers."*

(*Id.* at Pg. ID 10738-40.)  Count I goes on to state that "Chief Hayse knowingly and intentionally misled and misinformed the Mayor and City Council regarding the identity of the person responsible."  (*Id.* at Pg. ID 10740.)  Based on the Amended Complaint, City Council voted to suspend Plaintiff with pay for an additional 20 days, pending a removal hearing.

On August 29 and 30, Defendants held a pretermination hearing.  During this hearing, Plaintiff—on at least six occasions—stated that he posted the "shaft" comment to the It Takes a Village page, not the Melvindale Police Department page.  (ECF No. 122-7 at Pg. ID 9103-06, 9109; *see also* ECF No. 121-7 at Pg. ID 7658.)  Nevertheless, Defendants sustained all counts—including Count I—and voted unanimously to terminate Plaintiff's employment "[b]ased on the evidence that was presented."  (ECF No. 121-24 at Pg. ID. 8822; ECF No. 122-7 at Pg. ID 9166.)

## Post-Termination Events

After this suit commenced, Defendant Barnes conceded that the two allegations included in Count I of the Amended Complaint—(i) "Misuse of the Melvindale Police Department's Social Media" and (ii) "Lying to the Mayor and City Council"—were non-terminable offenses.  (ECF No. 121-8 at Pg. ID 7776.)

Defendant Barnes also conceded that Defendants "didn't have the actual printout of the comment" on June 13, when they asked Plaintiff who posted the "shaft" comment to the official Melvindale Police Department page. (*Id*. at Pg. ID 7777.) But, sometime after June 13, she learned that Plaintiff had not in fact posted the "shaft" comment to the Melvindale Police Department page. (*Id*.)

As for the remaining Defendants, when discussing the location of the "shaft" comment during their depositions, nearly all of them referenced Count I as depicted in the Amended Complaint. Some then admitted that—as of the day of their deposition—they did not know where Plaintiff posted the "shaft" comment, while others confirmed through their testimony that they still hold the mistaken understanding that Plaintiff posted the "shaft" comment to the Melvindale Police Department page. (Land Dep., ECF No. 121-13 at Pg. ID 8354; Louvet Dep., ECF No. 121-17 at Pg. ID 8518-19; Densmore Dep., ECF No. 121-16 at Pg. ID 8446, 8466-67, 8468-69; Cybulski Dep., ECF No. 121-12 at Pg. ID 8242-43; Marsee Dep., ECF No. 125-25 at Pg. ID 8873.)

## LEGAL STANDARD

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor.  *See Liberty Lobby*, 477 U.S. at 255 (citation omitted).

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion,

"including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments.  *See, e.g., St. v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

## FIRST AMENDMENT – RETALIATION

Plaintiff alleges that Defendants violated his First Amendment free speech right by terminating his employment after he posted the "shaft" comment.  To establish a First Amendment retaliation claim, the Sixth Circuit requires that: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."  *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (citations omitted).  In this case, Defendants do not dispute that the termination of Plaintiff's employment constituted an adverse action.

"If the employee establishes a *prima facie* case, the burden then shifts to the employer to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'  Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the [non-moving party], no reasonable juror could fail to return a verdict for the [moving party]."  *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294-95 (6th Cir. 2012) (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010)).

### (A) Did Plaintiff Engage in Constitutionally Protected Activity?

To prove that the "shaft" comment was constitutionally protected, Plaintiff "must show (1) that [his] speech was made as a private citizen, rather than pursuant to [his] official duties; (2) that [his] speech involved a matter of public concern; and (3) that [his] interest as a citizen in speaking on the matter outweighed the [Defendants'] interest, as an employer, in 'promoting the efficiency of the public services it performs through its employees.'"  *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012) (emphasis added) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417-18 (2006)).  The question of whether a public employee's speech is protected is a question of law for the Court to decide.  *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464-65 (6th Cir. 2017).

### (i) Did the Protected Activity Touch on A Matter of Public Concern?

Defendants argue that Plaintiff's protected conduct did not touch on a matter of public concern because it demonstrated that he personally did not favor the dispatch system merger. (ECF No. 125 at Pg. ID 10248.) The Sixth Circuit has found it "plainly illogical and contrary to the broader purposes of the First Amendment" to assert that "an individual's *personal* motives for speaking may dispositively determine whether that individual's speech addresses a matter of *public* concern." *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 574 (6th Cir. 1997)). And though the "shaft" comment may have been offensive to Defendants for one reason or another, "[t]he inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987). "[T]he pertinent question is not *why* the employee spoke, but *what* he said." *Mayhew*, 856 F.3d at 467 (citation omitted).

The Supreme Court has found that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement . . . ." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Here, regarding form, the comment was one of many made on a Facebook page visited by many Melvindale residents. *See Handy-Clay*, 695 F.3d at 544

15

(suggesting that speech is matter of public concern when made to "public at large"); *Connick*, 461 U.S. at 148 (suggesting public concern where speech "seek[s] to inform the public"); *but see Pyscher v. Mount Pleasant Pub. Sch. Sys.*, 2007 WL 485956, at *2 (E.D. Mich. Feb. 9, 2007) (finding no public concern where speech never addressed to public or beyond workplace).

Regarding context, the comment was made in the middle of a debate about an issue on which several public meetings had been held and lengthy social media discussions had taken place. Contrary to Defendants' contention, (ECF No. 125 at Pg. ID 10260-61), the "shaft" comment "cannot be written off as a 'matter only of personal interest' or a [] disgruntled [employee's] 'grievance[s] concerning internal office policy.'" *Kindle v. City of Jeffersontown*, 374 F. App'x 562, 568 (6th Cir. 2010) (third alteration in original) (quoting *Connick*, 461 U.S. at 147). The finding of public concern is strengthened by the fact that, before making the "shaft" comment, Plaintiff did not himself solicit comment on the dispatch merger issue, but "simply responded to questions regarding an existing controversy." *Matulin v. Vill. of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988).

As it concerns content, it is unclear whether Plaintiff's "shaft" comment meant taxpayers would pay more for the same quality of dispatch services, or taxpayers would pay the same amount for less quality dispatch services. However,

16

it is clear under Sixth Circuit precedent that speech about public safety, as well as how "increasing or decreasing government spending may affect public health and safety," are quintessential matters of public concern. *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 527 (6th Cir. 2015) (citations omitted). Here, Melvindale residents discussed at length the potential increase in costs, increase in response times, and a possible attendant increase in the number of lives lost. *See Chappel*, 131 F.3d at 578 (explaining that "matters of public safety" are "near [the] zenith of public concern" and finding that speech was on matter of public concern where fire department planned to spend tax money on new rescue truck); *Oakes v. Weaver*, 331 F. Supp. 3d 726 (E.D. Mich. 2018) (finding chief legal officer's speech touched on public concern where city placed under receivership during water contamination crisis and citizens would be concerned about proposals to commit to borrowing millions of dollars city could not repay); *see also Mayhew*, 856 F.3d at 467 (holding public concern where speech relates to "social[] or other concern to community" or is "subject of general interest and of value and concern to public" (quoting *Lane v. Franks*, 573 U.S. 228, 241 (2014))).

Defendants argue that Plaintiff's speech, even if on a matter of public concern, loses that status because the speech was knowingly false or made in reckless disregard for the truth. The burden is on Defendants to establish that

Plaintiff's statement that "[t]he one getting the shaft may be the taxpayers" was false or was made in reckless disregard for the truth. *See Chappel*, 131 F.3d at 576.

But, nearly all of Defendants' arguments concern comments other than the "shaft" comment. (ECF No. 125 at Pg. ID 10237-38, 10248-50.) Furthermore, though Defendants contend that "Plaintiff made numerous comments . . . through his own Facebook account" and "[t]hese comments are incontrovertible evidence that Plaintiff knowingly and/or recklessly made false statements," (*id*. at Pg. ID 10249), this argument does not explain how the "shaft" comment was false. In addition, while Defendants argue that Plaintiff "summariz[ed] [three] false statements" to make the "conclusory statement" that "[t]he one getting the shaft may be the taxpayers," (*id*. at Pg. ID 10250), Defendants point to no record evidence to support this theory and—contrary to Defendants' assertion, (*id.*)—the evidence proffered to show the falsity of the "[three] false statements" fails to demonstrate the falsity of the "shaft" comment. Finally, Defendants argue that Plaintiff knew the "shaft" comment was false, "as shown by his admissions during the June 15, 2016 council meeting that (1) merging with Dearborn would not increase response times and (2) that the [proposed dispatch] system would be an enhancement to the current system." (*Id*.) However, the record shows that

Plaintiff made no admission regarding response times during the June 15, 2016 council meeting. And it was only after "surmising" certain facts in a hypothetical posed by Defendant Louvet that Plaintiff agreed that the dispatch merger would be an enhancement. (*Id.* at Pg. ID 11632.) This "admission" does not prove that Plaintiff knowingly or recklessly lied when he wrote that "[t]he one getting the shaft may be the taxpayers."

In sum, because Defendants fail to show that Plaintiff's speech was knowingly false or made in reckless disregard for the truth, Plaintiff's speech does not lose its status as a matter of public concern.

### (ii) Did Plaintiff Speak as A Private Citizen?

The critical question when determining whether an employee speaks as a private citizen or as a public employee is whether the public employee made the statement *pursuant to official duties*. *Garcetti*, 547 U.S. at 424; *see also Lane*, 573 U.S. at 240) ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."); *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) (explaining that speech made pursuant to official duties is made in furtherance of ordinary responsibilities of employment).

Among the factors the Sixth Circuit considers when determining whether an employee's speech was made pursuant to his official duties are (i) "the ordinary scope of the employee's duties"; (ii) "the setting"; (iii) "the audience"; (iv) "the subject matter of the speech"; and (v) "the impetus for the speech." *Holbrook v. Dumas*, 658 F. App'x 280, 288 (6th Cir. 2016) (citing *Handy-Clay*, 695 F.3d at 540 and *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007)).

These factors support the conclusion that Plaintiff made the "shaft" comment as a private citizen, not pursuant to his official duties. Here, the setting was the public It Takes A Village Facebook page; the audience consisted of Melvindale residents; the subject matter was one of public concern; and the impetus for the speech was a Melvindale resident's comment, which tagged Plaintiff's personal "Chad Hayse" username. *See Handy-Clay*, 695 F.3d at 542 (finding no speech pursuant to official duties where conversations held with individuals outside plaintiff's department); *but see Holbrook*, 658 F. App'x at 288 (finding speech pursuant to official duties where plaintiff "sent the e-mail as Fire Chief, from his official e-mail account, to fire department employees, informing them of a development potentially affecting their employment, out of a sense of duty to them and concern for their well-being"); *Housey v. Macomb Cty.*, 534 F.

App'x 316, 322-23 (6th Cir. 2013) (finding speech pursuant to official duties when made via employer's communication channels and not through public channels).

Defendants argue that Plaintiff made the "shaft" comment pursuant to his official duties because the comment "owed [its] existence" to "information Plaintiff obtained as Chief of Police, not through public meetings." (ECF No. 125 at Pg. ID 10255, 10257-58 (quoting *Garcetti*, 547 U.S. at 421-22).) The Sixth Circuit has "admonish[ed] that speech is not transformed into 'employee—rather than citizen—speech' simply because it 'concerns information acquired by virtue of [the speaker's] public employment.'" *Boulton*, 795 F.3d at 534 (second alteration in original) (quoting *Dougherty v. Sch. Dist. Of Phila.*, 772 F.3d 979, 990 (3d Cir. 2014)).

And while Defendants argue that Plaintiff's job included "responding to citizens regarding the safe and efficient functioning of the Police Department," (ECF No. 125 at Pg. ID 10254), the relevant portion of Plaintiff's job description states that the Chief of Police "shall direct the public relations of the *Department*." (ECF No. 125-17 at Pg. ID 10770). Plaintiff directed the public relations of the *department* when he logged onto the official Melvindale Police Department page to post the "workshop reminder" comment. Plaintiff's ordinary responsibilities did

not include logging onto his personal Facebook page after hours to respond to social media posts tagging his "Chad Hayse" username.

This conclusion is supported by the fact that (i) Melvindale police officers did not have to abide by any personal social media policy, (ECF No. 121-8 at Pg. ID 7776); (ii) the "Communications/Correspondence" section of the Melvindale Police Department Rules & Regulations prohibits the use of "departmental letterheads" and "[police officers'] signatures" when communicating externally—not the use of  personal names, (ECF No. 125-17 at Pg. ID 10789); and (iii) Defendants concede that Plaintiff had the First Amendment right to post the "shaft" comment.  (*See, e.g.*, ECF No. 121-8 at Pg. ID 7789.)

Defendants further argue that, within the It Takes A Village comment thread, someone addressed Plaintiff as "Chief Hayse" and "Plaintiff never clarified . . . that he was providing his personal opinions as a citizen and not as the highest-ranking law enforcement officer." (ECF No. 125 at Pg. ID 10254.)  Even if true, it does not matter that Plaintiff did not clarify.  *Cf. Westmoreland v. Sutherland*, 662 F.3d 714, 719 (2011) (finding that plaintiff spoke as a private citizen where, even though "[he] identified himself as a public employee, he appeared off duty, out of uniform, and at a public meeting . . . during the public comment period").  Plaintiff could still speak as one of "'the members of a community most likely to have

informed and definite opinions' about a wide range of matters related, directly or indirectly, to their employment." *Borough of Duryea. v. Guarnieri*, 564 U.S. 379, 387-98 (2011) (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 572 (1968)) (finding that some "benefits" of the "deliberative process" "may not accrue if one class of knowledgeable and motivated citizens is prevented from engaging"). For these reasons, the Court finds that Plaintiff made the "shaft" comment as a private citizen.[4]

### (iii) Did Plaintiff's Interest Outweigh Defendants' Interest?

The *Pickering* balancing test requires the Court to weigh "the employee's interest in 'commenting upon matters of public concern'" against "the interest of the State, *as an employer*, in promoting the efficiency of the public services it performs through its employees." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (emphasis added) (quoting *Pickering*, 391 U.S. at 568).

The Court begins by assessing Plaintiff's interest in making the "shaft" comment. Plaintiff undoubtedly had a legitimate interest in speaking on the dispatch merger because the "shaft" comment was an "expression on public issues," as the Court has already found, and thus "rest[s] on the highest rung of the

---

[4] For these same reasons, the Court finds Defendants' remaining arguments, (ECF No. 125 at Pg. ID 10252), unpersuasive or inapt.

hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458

U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)); *see also*

*Connick*, 461 U.S. at 152-53 (explaining that the greater the extent to which the

speech involves matters of public concern, the stronger the employer's showing

must be).

Next, the Court considers Defendants' interest in promoting the efficiency of

policing services. When conducting this balancing test, the Sixth Circuit considers

whether an employee's comments (i) "meaningfully interfere with the performance

of her duties"; (ii) "undermine a legitimate goal or mission of the employer"; (iii)

"create disharmony among co-workers"; (iv) "impair discipline by superiors"; or

(v) "destroy the relationship of loyalty and trust required of confidential

employees." *Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003) (citation

omitted). Speculative concerns or conclusory assertions of workplace disharmony

do not outweigh a plaintiff's First Amendment rights. *See Gillis v. Miller*, 845

F.3d 677, 685 (6th Cir. 2017) (citation omitted).

As an initial matter, Defendants do not argue that the "shaft" comment in

fact interfered with Plaintiff's ability to perform his duties as Chief of Police,

promoted disharmony among members of the police department, impaired

discipline by police department supervisors, or destroyed any relationship of

loyalty and trust required of police department employees. Indeed, there is no

relationship between the "shaft" comment and any of these factors. *See Pickering*,

391 U.S. at 572-73 (finding plaintiff's interest greater where no relationship

between letter and proper performance of teacher's daily duties in the classroom).

Defendants instead argue that the "shaft" comment undermined the

legitimate goal of promoting the dissemination of accurate information, which

would enable informed judgments regarding the dispatch merger issue. (ECF No.

125 at Pg. ID 10263-64.) This argument, however, articulates Defendants' interest

as *City Council* in shaping the public's view of the merger issue—not Defendants'

interest as *an employer* in ensuring that *policing* services go uninterrupted. *See*

*Majchrzak v. Cty. of Wayne*, 838 F. Supp. 2d 586, 595 (E.D. Mich. 2011) (finding

plaintiff's interests greater where speech neither impeded ability to perform job

duties nor interfered with the sewage facility operation).

Defendants further contend that, "[g]iven that Plaintiff was responding to

questions regarding the functioning of the police department," Plaintiff should

have used "caution to avoid interfering with services provided by the City of

Melvindale." (ECF No. 125 at Pg. ID 10266.) When there is no evidence of actual

disruption—as is the case here—the Court must "assess whether the employer

could reasonably predict that the employee speech would cause disruption, in light

of the manner, time, and place the speech was uttered, as well as the context in which the dispute arose." *Gillis*, 845 F.3d at 687 (internal quotation marks and citations omitted).

Based on the record, the Court is unable to conclude that Defendants reasonably predicted that the "shaft" comment would cause disruption within the police department. One reason is that the "shaft" comment did not contain "particularly inflammatory," "abusive," or "exceptionally insulting" language that could stir controversy among members of the police department. *See Rodgers*, 344 F.3d at 601. Another reason is that the public's reaction to the "shaft" comment, as detailed in Defendants' arguments, provides little insight into what predictions Defendants made about how the comment would disrupt the police department.

Accordingly, the Court finds that the balancing test weighs in Plaintiff's favor and the "shaft" comment was constitutionally protected activity.

## (B) Was Plaintiff's Termination Motivated, At Least in Part, by The Protected Conduct?

When arguing that termination was motivated, at least in part, by protected conduct, a plaintiff "may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent. Rather, the employee must link the speech in question to the defendant's decision to dismiss

her." *Bailey v. Floyd Cty. Bd. Of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997) (citation omitted)).

Defendants assert that "[t]here is no dispute: Plaintiff was not charged with improperly commenting that the taxpayers may be the ones 'getting the shaft.'" (ECF No. 125 at Pg. ID 10268.) This argument flatly contravenes reality—as revealed by the Amended Complaint, the pretermination hearing, and Defendants' sworn deposition testimony.

Count I in the Amended Complaint states that "Chief Hayse also posted numerous inaccurate and irresponsible comments, which include the [] remark [that] . . . '[t]he one getting the shaft may be the taxpayers.'" (ECF No. 121-15 at Pg. ID 8413.) In addition, not only was the "shaft" comment mentioned or discussed at least six times during Plaintiff's pretermination hearing, (ECF 122-7 at Pg. ID 9101-06), but also Defendants terminated Plaintiff's employment "*based on* the evidence that was presented" during the hearing, (ECF No. 121-24 at Pg. ID. 8822)—a hearing that discussed, among other counts, Count I. And Defendants explicitly stated during depositions that they fired Plaintiff *because of* the "shaft" comment. (*See, e.g.*, ECF No. 121-8 at Pg. ID 7791; ECF No. 121-17 at Pg. ID 8518; ECF No. 121-16 at Pg. ID 8467-68.) *See Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 853-54 (E.D. Mich. 2015), *aff'd*, 655 F.

App'x 495 (6th Cir. 2016) ("Where [] reprimands plainly stated that they were issued *because of* the plaintiff's speech, there certainly is adequate evidence to support a finding that the protected speech was the cause of the adverse action.").

Thus, the Court finds that Plaintiff has presented sufficient evidence to support a *prima facie* case of First Amendment retaliation.

## (C) Would Defendants Have Made Same Decision Absent Protected Conduct?

The Court must next determine whether Defendants have shown by a preponderance of the evidence that they would have taken the same action absent the "shaft" comment. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The Court finds that the minds of reasonable jurors could diverge at this juncture in the analysis.

Defendants argue that, even if Plaintiff had not made the "shaft" comment, they would have terminated his employment based on the pretermination hearing testimony as to Counts II through V. The Sixth Circuit has held that when a plaintiff "contests the facts underlying the incident that led to his termination," the question of material fact is sufficient to defeat a motion for summary judgment. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436-37. Because Plaintiff contests the factual bases of Counts II through V, (*see* ECF No. 128 at Pg. ID 14913-14), summary judgment is unwarranted.

Regarding Count II ("Knowingly and Intentionally Providing False Statements To the Commission of Public Safety"), Defendants argue that Plaintiff told the PSC that "[t]he installation of Melvindale's new 911 dispatch has been delayed due to [] discussions . . . regarding a Central Dispatch." (ECF No. 125-16 at Pg. ID 10743.) Plaintiff argues that, "[c]ontrary to Defendants' assertions," Plaintiff previously stated that "he did not recall using the exact words Defendants attributed to him, but rather that, based on his emails with [Officer] Heck, told the PSC that there would be a later-than-anticipated installation." (ECF No. 126 at Pg. ID 11844 n.6.)

As to Count III ("Willful Misconduct in Office upon the Usage of Towing Services"), Defendants argue that Plaintiff performed background checks on the owner and/or employees of Goch & Son's Towing, but not Gene's Towing Services—a company Defendants argue that Plaintiff favored. (ECF No. 125-16 at Pg. ID 10747.) Plaintiff contends that he conducted background checks on the drivers of both companies. (ECF No. 126 at Pg. ID 11835.)

Regarding Count IV ("Willful Misconduct in Office by the Improper Issuance Of Discipline upon Corporal Matthew Furman"), Defendants argue that Plaintiff never provided Officer Furman with notice of his July 28th suspension.

(ECF No. 125-16 at Pg. ID 10754.)  Plaintiff argues that Furman did receive

notice.  (ECF No. 126 at Pg. ID 11847.)

Concerning Count V ("Willful Misconduct in Office by the Usage of

Profanity, Vulgarity, and Slanderous Statements Directed Towards Elected and

Appointed Public Officials"), Defendants contend that Plaintiff used derogatory

terms in public to describe the Mayor and appointed officials.  (ECF No. 125-16 at

Pg. ID 10760.)  Plaintiff argued that he did not make such statements.  (ECF No.

121-7 at Pg. ID 7669; ECF No. 126 at Pg. ID 11850 n.8.)

Because of these factual disputes, it is unclear whether Defendants would

have terminated Plaintiff absent the "shaft" comment.  At the very least, the Court

need not accept this element of the claim as established beyond dispute for the

purpose of ruling on Plaintiff's and Defendants' summary judgment motions as to

the First Amendment claim.  Thus, both are denied.

<u>(D) Are Defendants Entitled to Immunity?</u>

Defendants argue that, even if the Court finds a First Amendment violation,

the individual Defendants are entitled to absolute immunity because their decision

to terminate Plaintiff's employment was a "legislative activity."  (ECF No. 122 at

Pg. ID 8948.)  This argument fails because Defendants' resolution to remove

Plaintiff as Chief of Police does not bear "the hallmarks of traditional legislation,"

such as policymaking that "implicat[es] [] budgetary priorities." *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998). In explaining why absolute immunity applied to a defendant in *Bogan*, the Supreme Court stated that the city council's ordinance "involved the termination of *a position*, which, unlike the hiring or firing of *a particular employee*, may have prospective implications that reach well beyond the particular occupant of the office." *Id.* at 56 (emphasis added). Here, Defendants fired a particular employee—they did not eliminate the Chief of Police position.

Defendants' qualified immunity defense also fails because Defendants have not shown that the applicable law was not clearly established at the time Defendants acted. *See Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999) ("[G]overnment officials are immune from civil liability when acting in their official capacities if their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (internal quotations marks and citations omitted)).

## FOURTEENTH AMENDMENT – DUE PROCESS CLAIMS

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property

interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).  In this case, Plaintiff alleges procedural due process violations of liberty and property interests.

<u>Liberty Interests</u>

Critically, a due process violation of a liberty interest occurs only when "upon request for a name-clearing hearing, the employee is denied." *Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002) (citations omitted).  The Sixth Circuit "has consistently held that a plaintiff's failure to request a name-clearing hearing is fatal to a claim alleging a deprivation of a liberty interest without due process." *Id.* at 323.  Here, Plaintiff did not request a name-clearing hearing.

Plaintiff's counterarguments as to this claim are unpersuasive because they fail to explain why Plaintiff is absolved from this specific requirement.  (*See* ECF No. 126 at Pg. ID 11865.)  Notably, Plaintiff does not cite—and this Court did not find—a single decision where a court excused the plaintiff's failure to request a name-clearing hearing for *any* reason.  Accordingly, the Court grants Defendants' Motion for Summary Judgment as to this claim.

Property Interests

To prevail on a claim alleging a due process violation of a property interest, Plaintiff must show he possessed a property interest in his continued employment. *Bailey*, 106 F.3d at 141 (citations omitted). "The existence of a property interest depends largely on state law." *Id.* (citations omitted). "[A] public employee does not have a property interest in continued employment when his position is held at the will and pleasure of his superiors and when he has not been promised that he will only be terminated for good cause." *Chilingirian v. Boris*, 882 F.2d 200, 203 (6th Cir. 1989) (citations omitted).

"[T]o establish a protected interest" in a government position, an employee "must . . . point to some statutory or contractual right . . . which supports a legitimate claim to continued employment." *Bailey*, 106 F.3d at 141. In this case, Plaintiff argues that Chapter 13 of the Melvindale City Charter ("Charter") "specifies that appointed officials, like Plaintiff, may only be removed from their positions for cause." (ECF No. 126 at Pg. ID 11857.) The Court agrees.

The Charter is far from a model of clarity. Per Michigan law, the Court uses traditional principles of statutory construction to interpret the charter language. *City of Detroit v. Walker*, 520 N.W.2d 135, 139 (Mich. 1994) (citation omitted).

33

### *Who Is An "Appointed Officer"?*

A close reading of the Charter reveals that the words "appointive" and "appointed" are used interchangeably in reference to officers and officials— sometimes within the same chapter and/or section. (*See, e.g.*, ECF No. 125-3 ("appointed" and "appointive" both used in Chapter 12, Section 5; Chapter 13; Chapter 18; Chapter 21, Section 4; and Chapter 33).) The Court will use the phrase "appointed officer" for the purposes of this opinion.

Chapter 20, Section 6 of the Charter—titled "Commission of Public Safety: Chief of Police Department"—states that the PSC "shall appoint an individual as Chief of the Police Department." (ECF No. 122-3 at Pg. ID 8990.) There is no dispute that Plaintiff is an "appointed officer": both Plaintiff and Defendants describe Plaintiff, who was in fact appointed by the PSC, as such. (*See, e.g.*, ECF No. 122 at Pg. ID 8929, 8935 (describing Plaintiff as an "appointive officer" and an "appointed official"); ECF No. 121 at Pg. ID 11857 (describing Plaintiff as an "appointed official") (hereinafter "PSC-appointed officer").)

Notably, there is a second category or type of "appointed officer": those appointed not by the PSC, but nominated by the Mayor and confirmed by City Council as required by Chapter 7, Section 10 of the Charter. (ECF No. 122-3 at

Pg. ID 8972 (hereinafter "Mayor/Council-appointed officer" and "Nominate & Confirm Provision").)

Eight other provisions within the Charter support an interpretation that recognizes this second category of officers. These eight provisions state that the following positions shall be filled following nomination by the Mayor and confirmation by the City Council: (i) Library Commission; (ii) City Assessor; (iii) City Administrator; (iv) Acting City Administrator; (v) Corporation Counsel; (vi) City Engineer; (vii) Director of Public Works; and (viii) Director of the Department of Water Supply. (*Id.* at Pg. ID 8963, 8977, 8981-84, 8986.) As can be seen, Plaintiff's position—Chief of Police—is not one of the eight positions listed above. In fact, unlike the provisions that describe these eight positions, the provision that describes the Chief of Police position does not mention the Nominate & Confirm Provision at all. (*Id.* at Pg. ID 8990.) And notably, Defendants do not attempt to proffer an argument that explains away this fact. It follows then that PSC-appointed officers are distinct from Mayor/Council-appointed officers.

### *Which "Appointed Officers" Can Be Removed Only For Cause?*

Chapter 13, Part A, Section 1—titled "Removal of Officials: Appointed Officials: Who May Be Removed and Causes for Removal"—states that "[t]he

Council may remove from office any appointive official of the City for any of the

following causes . . . ." (*Id*. at Pg. ID 8979 (hereinafter "For-Cause Provision").)

Because Plaintiff was an "appointive official," as a PSC-appointed officer, the

Court concludes that Plaintiff had a property interest in his continued employment.

The Court finds Defendants' counterarguments unpersuasive. First,

Defendants state that "Chapter 33, Section 22 of the [Charter] provides that '[a]ll

appointive officers excepting the Public Safety Commission, the Civil Service

Commission and the Board of Review . . . shall hold their offices at the will and

pleasure of the Mayor and Council.'"[5] (*Id*. at Pg. ID 8932 (hereinafter "At-Will

Provision").) Defendants argue that the For-Cause Provision "only applies to those

who are specifically excluded in [the At-Will Provision]" and, because the Chief of

Police position is not specifically excluded, Plaintiff was subject to the At-Will

Provision. (*Id*.)

Defendants method of quoting the Charter language is—at best—

excessively selective. The first sentence of the At-Will Provision reads *in full*:

"All appointive officers excepting the Public Safety Commission, the Civil Service

_____

[5] To clarify the Charter language, the Court notes that these three bodies are not
"appointive officers." Rather, they are bodies that are made up of "appointive
officers."

Commission and the Board of Review ***shall be made under [the Nominate &***

***Confirm Provision] of this Charter, and such officers*** shall hold their offices at

the will and pleasure of the Mayor and Council."[6]  (ECF No. 122-3 at Pg. ID

9024.)  Defendants' ellipses do more than eliminate what Defendants may perceive

to be surplusage—they reshape meaning.

Assuming that Defendants omitted the Nominate & Confirm Provision

language because they believe it to be irrelevant to the meaning of the At-Will

Provision, the Supreme Court has held that reading out language *expressly* inserted

into a statute counters the principle of statutory construction that requires courts to

"give effect, if possible, to every clause and word of a statute.'"  *Montclair v.*

*Ramsdell*, 107 U.S. 147, 152 (1883)); *see also Astoria Fed. Sav. & Loan Ass'n v.*

*Solimino*, 501 U.S. 104, 112 (1991) ("[W]e construe statutes . . . so as to avoid

rendering superfluous any parts thereof." (citation omitted)).

Notably, the "rule of the last antecedent" provides that "a limiting clause or

phrase . . . should ordinarily be read as modifying only the noun or phrase that it

immediately follows."  *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (citation

---

[6] To further clarify the Charter language, the At-Will Provision references "Chapter 10, Section 7," but such a provision does not exist.  Based on the parties' briefings, the Court assumes the drafters of the Charter meant to reference "Chapter 7, Section 10"—the Nominate & Confirm Provision.

omitted); *see also Lockhart v. United States*, 136 S. Ct. 958, 962-63 (2016) (discussing rule). Applying the last antecedent principle here, the phrase "such officers" modifies the phrase that it immediately follows: "shall be made under [the Nominate & Confirm Provision]." This means that all appointive officers made under the Nominate & Confirm Provision—namely, Mayor/Council-appointed officers—are the category of officers who "shall hold their offices at the will and pleasure of the Mayor and Council."

The Court agrees with Defendants' assertion that "the Public Safety Commission, the Civil Service Commission and the Board of Review"—which are made up of Mayor/Council-appointed officers[7]—are specifically excluded from serving at the will and pleasure of the Mayor and Council. (ECF No. 122 at Pg. ID 8932.) But this means only that the appointees that make up those three bodies constitute a subset of *Mayor/Council*-appointed officers that are excluded from serving at the will and pleasure of the Mayor and Council.

---

[7] The three Charter provisions that describe the appointment process for seats on the Public Safety Commission (Chapter 20, Section 1), the Civil Service Commission (Chapter 21, Section 1) and the Board of Review (Chapter 19, Section 1) explicitly state that these seats shall be filled under the Nominate & Confirm Provision, making them Mayor/Council-appointed officers. (ECF No. 122-3 at Pg. ID 8987, 8989, 8992.

Critically, the Chief of Police is *not* a Mayor/Council-appointed officer. Accordingly, contrary to Defendants' contention, it does not matter that the Chief of Police is not also specifically excluded from serving at the will and pleasure of the Mayor and Council. Thus, Defendants' argument fails.

Second, Defendants argue that the At-Will Provision "must be reconciled" with the For-Cause Provision. (*Id.* at Pg. ID 8935-36.) But, the Court finds that the two provisions already work in harmony. Nothing in the For-Cause Provision suggests that it is limited to either PSC-appointed officers or Mayor/Council-appointed officers. Thus, reading the For-Cause and At-Will Provisions together, all PSC-appointed officers *and* the "appointed officers" who make up "the Public Safety Commission, the Civil Service Commission and the Board of Review" may be discharged only for cause.

In sum, the Court finds that Plaintiff could only be removed for cause. Thus, Plaintiff had a property interest in his continued employment.

### *What Process Was Due?*

"In the context of employment rights, the Supreme Court has explained that 'the root requirement of the Due Process clause' is 'that an individual be given the opportunity for a hearing before he is deprived of any significant property interest.'" *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004) (quoting

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). The requisite formality of the pre-termination—or right-of-reply—hearing depends upon the nature and extent of the post-termination proceedings. *See Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004) (citing *Duchesne v. Williams*, 849 F.2d 1004, 1006-07 (6th Cir. 1988)).

But here, Plaintiff focuses only on the former, arguing that he "was denied a true pre-termination hearing" because the hearing was merely a "sham." (ECF No. 126 at Pg. ID 11863.) This "sham" hearing, Plaintiff contends, denied him a "true opportunity to fully present his side of the story" at the pre-termination stage as required by *Loudermill*. (*Id*.); *see Farhat*, 370 F.3d at 595 (quoting *Loudermill*, 844 F.2d at 304)). For two reasons, the Court finds a material fact issue exists as to whether Plaintiff received a "sham" hearing.

First, a reasonable jury could find that—by placing a screenshot of the Melvindale Police Department home page just before the "shaft" comment (instead of, for example, a screenshot of the It Takes A Village home page)—Defendant Barnes essentially fabricated Count I of the Amended Complaint. In fact, the record suggests that the Amended Complaint may have been the source of some Defendants' confusion: during their respective depositions, three defendants pointed to the Amended Complaint when asked if they knew where the "shaft"

comment was posted.  (Marsee Dep., ECF No. 125-25 at Pg. ID 8873; Cybulski

Dep., ECF No. 121-12 at Pg. ID 8242-43; Densmore Dep., ECF No. 121-16 at Pg.

ID 8446, 8466-67, 8468-69).  Such fabrication would be akin to the act described

in *Bettio v. Village of Northfield*.  In that case, the court found that,"[w]here the

charges brought against the employee [were] false and are known to be false by the

decisionmaking officials," the pre-termination hearing is "sham" because "the

primary purpose of the minimal 'right-of-reply' hearing—to guard against

mistaken decisions—is not furthered."  *Bettio v. Vill. of Northfield*, 775 F. Supp.

1545, 1564; *see also Zavatson v. City of Warren*, 714 F. App'x 512, 528 (6th Cir.

2017) (discussing *Bettio*).  Indeed, if it is found that Defendant Barnes fabricated

Count I, it follows that a hearing in which these knowingly false charges have been

brought "fail[s] to meet the third prong of the *Loudermill* test, in that the employee

clearly has had no opportunity to present his side of the story."  *Bettio*, 775 F.

Supp. at 1585.

Second, it is undisputed that Count I was based on a falsity—specifically,

the erroneous fact that Plaintiff posted the "shaft" comment to the Melvindale

Police Department page.  The Supreme Court has explained that, where "the

controlling facts" of a disciplinary process are disputed, "the risk of error is not at

all trivial, and it should be guarded against if that may be done without prohibitive

cost or interference." *Goss v. Lopez*, 419 U.S. 565, 580 (1975); *see also Duchesne*, 849 F.2d at 1007 (explaining that the *Loudermill* Court suggested that its decision is an application of principles announced in *Goss*). Here, one of "the controlling facts" underlying Count I was the location of the "shaft" comment. In fact, Count I was titled, in part, "Misuse of the *Melvindale Police Department's* Social Media." Surely, pinning down the location of the "shaft" comment was essential to determining the veracity of Count I. But, somehow, Defendants got it wrong. In fact, while Defendant Barnes explicitly admits that she was wrong about the location of the "shaft" comment, (ECF No. 121-8 at Pg. ID 7777), the other Defendants admit or suggest that, as of the day of their respective depositions, they still do not know or are unclear about where the comment was posted. (Land Dep., ECF No. 121-13 at Pg. ID 8354; Louvet Dep., ECF No. 121-17 at Pg. ID 8518-19; Marsee Dep., ECF No. 125-25 at Pg. ID 8873; Cybulski Dep., ECF No. 121-12 at Pg. ID 8242-43; Densmore Dep., ECF No. 121-16 at Pg. ID 8446, 8466-67, 8468-69).

It is true that "*Loudermill* does not require that the opportunity to respond to the allegations definitely resolves the propriety of the discharge." *Buckner v. City of Highland Park*, 901 F.2d 491, 496 (6th Cir. 1990). It is also true that the post-termination hearing—as opposed to the pre-termination hearing—serves as the

opportunity to "ferret out bias, pretext, deception and corruption." *Duchesne*, 849 F.2d at 1008. But, as the Sixth Circuit has explained, "there may be cases . . . in which the supervisory official is *so biased* that the *Loudermill* 'right-of-reply' process is meaningless." *see also Duchesne*, 849 F.2d at 1008 (emphasis added). A reasonable jury could find that this case is one of them.

The Sixth Circuit has explained that an employer is "alerted" to factual disputes during a pre-termination hearing when an employee "give[s] his version of events," thereby ensuring that the employer's "discretion will be more informed," "a meaningful hedge against erroneous action" is put in place, and "the risk of error [is] substantially reduced." *Duchesne*, 849 F.2d at 1007 (citations omitted); *see also Farhat*, 370 F.3d at 595 (quoting *Loudermill*, 470 U.S. at 545-46) (explaining that a "pretermination hearing is to provide an initial check against mistaken conclusions" and is "a determination of whether there are reasonable grounds to believe that the charges . . . are true").

In *Buckner*, the Sixth Circuit found that the pre-termination hearing was "meaningful" because the plaintiff "was offered the opportunity to provide evidence which might have dissuaded" the defendants from terminating him. 901 F.2d at 495-96. Here, in contrast, the record could support the conclusion that while Plaintiff was able to offer evidence, the pre-termination hearing was not

"meaningful" because Defendants could not be dissuaded regarding their faulty understanding of the location of the "shaft" comment. For example, (i) Plaintiff told Defendants at least six times during the pre-termination hearing that they were mistaken regarding the location of the "shaft" comment; (ii) the Mayor forwarded copies of the relevant Facebook posts to Defendants on the night of June 13; (iii) during the pre-termination hearing, Plaintiff placed into evidence a five-page exhibit which included the "shaft" comment and the label "Melvindale it takes a village" across the top of each page; and (iv) that exhibit was placed into evidence only after Melvindale resident John Sabo confirmed that the exhibit was an "original" "printed off" of the "Melvindale It Takes A Village Facebook page." (ECF Nos. 122-7 at Pg. ID 9103-06, 9109; 121-10 at Pg. ID 8064-65; 122-34 at Pg. ID 10152; 121-14 at Pg. ID 8742-43.) A reasonable jury could find that Defendants could have easily "guarded against" the risk of error "without prohibitive cost or interference" to Melvindale by—for example—viewing the Melvindale Police Department page themselves (as any Melvindale resident likely could have done), reviewing the posts forwarded by the Mayor weeks earlier, or taking a moment to look at Plaintiff's exhibit.

Put another way, after considering the simplicity of the steps Defendants elected not to take in order to confirm their conclusion regarding the location of the

"shaft" comment, a reasonable jury could find that Defendants' persistent error regarding this "controlling fact" can be explained away only by a bias so immutable that Plaintiff never received the requisite "meaningful" "opportunity to present his [] side of the story" at the pre-termination stage. *See Loudermill*, 470 U.S. at 543, n.8; *Buckner*, 901 F.2d at 495; *Duchesne*, 849 F.2d at 1008 (explaining that a defendant could be "*so biased* that the *Loudermill* 'right-of-reply' process is meaningless"); *see also Chmielinski v. Massachusetts*, 513 F.3d 309, 318 (1st Cir. 2008) (stating that *Loudermill* requirements are not met when "an[] error of *primary facts* in the grounds used for termination [] [can] be explained only by bias").

In sum, the Court finds that material fact questions regarding whether Plaintiff received a "sham" pre-termination hearing preclude summary judgment as to this claim.

## MUNICIPAL LIABILITY

Defendants assert that the City and City Council are entitled to immunity because "Plaintiff cannot establish that his injury was caused by an unconstitutional policy or custom." (ECF No. 122 at Pg. ID 8951.)

"A municipality is liable for a constitutional violation when execution of the municipality's policy or custom inflicts the alleged injury." *Jones v. City of*

45

*Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (citation omitted). "A plaintiff can make a showing of an illegal policy or custom by demonstrating . . . that an official with final decision making authority ratified illegal actions . . . ." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted). Yet, "[m]ere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).

Here, there is no dispute that the decisions of the individual Defendants were "final," "unreviewable," and "not constrained" by the policies of a superior authority. Thus, Defendants City and City Council are not immune.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion to Strike Affidavit of Nicole Barnes (ECF No. 129) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 121) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment as to Count I (Due Process - Property Interests) and Count II (First Amendment Retaliation) (ECF No. 122) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment as to Count I (Due Process - Liberty Interests) (ECF No. 122) is **GRANTED**.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 2, 2020